[L. A. No. 19138. In Bank. March 30, 1945.]

IDA FACKRELL, Respondent, v. CITY OF SAN DIEGO, Appellant.

J. F. Du Paul, City Attorney, and J. H. McKinney and Edward H. Law, Deputies City Attorney, for Appellant.

Ray L. Chesebro, City Attorney (Los Angeles), and Louis A. Babior, Deputy City Attorney, as Amici Curiae on behalf of Appellant.

S. G. North and Edgar G. Langford for Respondent.

SCHAUER, J.—Plaintiff brought this action to recover damages from the city of San Diego for injuries sustained

when the sidewalk upon which she was walking in the defendant city gave way under her, causing her to fall into a hole in the street. Plaintiff's right ankle was broken as a result of her fall. The action is based upon the Public Liability Act of 1923 (Stats. 1923, p. 675; Deering's Gen. Laws, 1944, Act 5619). After trial before the court without a jury judgment was rendered for the plaintiff. Defendant appeals. The basic question to be determined is whether the evidence is sufficient to sustain the finding that there existed a dangerous or defective condition in the street of which the defendant city had knowledge or notice as required by the act in order to impose liability upon it. We have concluded that on the record before us the judgment must be affirmed.

West Palm Street, upon which plaintiff's injury occurred, is a short street running in an east-west direction and connecting a San Diego residential district with direct routes to the Consolidated Aircraft factory. Prior to the winter of 1940-1941 the area of this street was in a natural state—a rather steep and rough hillside—and it had not been opened to traffic. In November, 1940, the city itself (not through an independent contractor) began to improve the street in order that it might be opened to facilitate the movement of workers to and from the aircraft factory. The work was done under the direction of one Milton Rader, defendant's street foreman in charge of new construction and general maintenance of streets.

The improvement work included the making of cuts and excavations varying in depth from a few inches to a maximum of about 13 feet, the grading of the surface into street form, and the creation of a dirt curbing on each side of the road and a dirt sidewalk ten feet wide extending from the northerly curb to the adjacent embankment which, opposite the place where plaintiff's injury was sustained, was several feet high. After the grading had been completed a light oil was sprayed over the roadway and against the curbs. Rader (the district street foreman) testified that the curbs were bevelled and sprayed with oil to provide a seal against erosion and to prevent dust from blowing. The oil, under pressure and at a temperature of 450 degrees Fahrenheit, was sprayed from a truck with a power pump and spread over the curbs a substantial distance onto the sidewalk, where it hardened and formed a crust having the appearance, according to one witness, of an oil and gravel surface. The extent to which the sidewalk was covered with oil depended materially upon the

strength of the wind blowing at the time the oil was applied. The coating so placed on the walk was allowed to remain.

Concerning the street generally Rader testified that after the grading and oiling had been completed "an ordinary individual" viewing the street "would have a tendency to think that there was pavement underneath" and would not "mistake it for just a good, hard California dirt street"; that the street "couldn't possibly be mistaken for a dirt street." Even if we assume that in so testifying the witness had in mind the roadway and not the sidewalk it would nevertheless follow that the trial court could have concluded that the portion of the sidewalk which was sprayed with oil likewise had the appearance of a paved sidewalk.

Rader testified that the overlap of oil on the sidewalk bordering the curb was "four to six, sometimes eight inches." The evidence produced by plaintiff indicated that such oiled strip on the sidewalk was approximately 18 inches wide at the point of the accident. There was also a conflict in the testimony as to the height of the curbs. Rader testified that the curbs did not exceed eight or ten inches in height, while witnesses for the plaintiff testified that the curbs were 12 to 18 inches high and that at the point where plaintiff fell there was a perpendicular drop from the sidewalk to the street level. For the purpose of drainage the sidewalk was so graded that it was approximately three inches lower at the curb than it was at the property line. After the improvement was completed, about January 8, 1941, a sign forbidding use of the street by the public was removed. From the time the work was completed until early February, 1941, Rader occasionally inspected the new roadway. Such inspections revealed a number of pot holes which Rader said were "usual" in streets treated as West Palm Street had been treated. It does not appear that anything was done to fill such holes.

Insofar as the sidewalk itself was concerned the improvement plan called for no maintenance inspections after grading and none were made. Mr. Rader testified that the sidewalk was considered to be "unimproved" and that "We don't try to maintain or keep up unimproved sidewalks, only when there is a bad wash or something that somebody has reported to us as dangerous"; "we pay no attention unless something is turned in to us as dangerous." He admitted that he had observed that "There is bound to be more erosion on a hill than there is on a level piece of ground." The position of the

defendant city in respect to the sidewalk, as reflected by its conduct and as stated by its counsel, is that "the City is not liable for pedestrians walking on an unimproved sidewalk. They walk at their own risk." As was reasonably to be expected rains came in late January and in March, 1941, and that portion of the walk nearest the embankment at the place where plaintiff fell became gullied and torn by erosion from the rainwater. A strip about 30 inches wide next to the curb was the only part of the sidewalk which remained apparently usable. This strip included the oiled surface. On March 21, 1941, at about 1:15 o'clock in the afternoon, as plaintiff was proceeding westerly toward her home, walking on the oiled portion of such remaining strip of ungullied sidewalk, the surface crust gave way under her feet. The oil coating had preserved the surface apparently intact but the waters had undermined and eroded beneath the crust so that a substantial area of sidewalk and curbing at that point crumbled away, precipitating plaintiff perpendicularly about one foot, from whence she further slid into a muck-filled pot hole about 18 inches out from where the curb had been and approximately two feet deep. In this fall plaintiff sustained the injury for which she seeks to recover.

Plaintiff testified that the hole in the street, prior to her fall, had the appearance of a "mud pie" formed in the crust of the street; that it was about five inches in diameter and that she did not "notice any depth to it." She first noticed the hole "about a couple of days before the accident." As plaintiff fell into the hole "it gradually got big"; "from the five inches it got to about two feet" deep and "wide enough to let [plaintiff's] body in."

Mrs. Margaret Crawford, a witness for plaintiff, testified that she had seen a hole in the street "just out from the sidewalk" where plaintiff fell; that it "was very small, around the first of January, but then after the rains, why it became larger." She further testified that about one week prior to plaintiff's injury she (Mrs. Crawford) suffered a similar fall, near the place where plaintiff fell, caused by the crumbling of the sidewalk.

The witness Rader (who, as previously mentioned, was district street foreman) testified as to the construction of the street and sidewalk and as to the effect of erosion on dirt sidewalks and streets. He stated that "when we put a dirt sidewalk in we more or less always expect to have to do work on

it''; that ''There is bound to be more erosion on a hill than there is on a level piece of ground'' and ''there is bound to be, on new work, erosion''; that a certain amount of erosion on unimproved property which is graded is anticipated; ''on unimproved property we don't cut to the line, so that erosion will not get on private property''; that an unimproved dirt sidewalk would be peculiarly subject to erosion during the rainy season and that ''It would be hard to say'' whether such a sidewalk would ''continue to be safe after it had gone through an average season of rain''; but that ''On our policy that we have tried to follow, the only thing that we ever repair on unimproved sidewalks is something that is reported to us as dangerous. We don't try to maintain or keep up unimproved sidewalks, only when there is a bad wash or something that somebody has reported to us as dangerous''; ''the sidewalk is classed as unimproved, and we pay no attention unless something is turned in to us as dangerous. The road is what we are interested in.''

The trial court found, among other things, that the defendant city had control of the street and sidewalk where plaintiff fell; that it ''negligently maintained'' them and that they were ''in a dangerous and defective condition''; that defendant, ''about January 8, 1941, had improved the street and sidewalk by grading the sidewalk and street and oiling the same and that by reason of said work the sidewalk and street was [sic] left in a condition which was inherently dangerous; that said inherently dangerous condition was known to the defendant and was not known to the plaintiff''; that ''the hole in the street adjacent to the sidewalk had existed for some time prior to March 21, 1941; that thereby the street and sidewalk were made dangerous and defective''; that defendant ''and its officers who had authority to remedy said defective and dangerous condition'' had notice and knowledge of such condition but ''failed and neglected for a reasonable time after acquiring said knowledge and receiving said notice to remedy said defective and dangerous condition''; and that as a proximate result of the dangerous and defective condition of the sidewalk and of the negligence of defendant plaintiff fell upon the sidewalk and into the hole in the street and was injured.

Plaintiff contends that the evidence amply supports the findings and shows that an inherently defective and dangerous condition was created by defendant and that therefore no other notice was necessary. She also contends that the

evidence is sufficient to support a finding that defendant was chargeable with constructive prior notice of the dangerous condition existing at the time of her injury. Defendant controverts both contentions and urges that from the evidence it should be concluded that plaintiff's injury came about through a latent defect of which it had no knowledge or notice. The Public Liability Act (Stats. 1923, p. 675; Deering's Gen. Laws, 1944, Act 5619) imposes liability upon municipalities for "the dangerous or defective condition of public streets, . . . grounds, works and property in all cases where the governing or managing board of such . . . municipality . . ., or other board, officer or person having authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of any such street, . . . grounds, works or property and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition."

The rule is well established that when it is shown that a certain street and sidewalk improvement has been planned by city officers and constructed in accordance with such plan, and that by carrying out the plan a dangerous or defective condition has been created, no further proof is needed to charge the city with notice of that condition. (*Rafferty* v. *City of Marysville* (1929), 207 Cal. 657, 663 [280 P. 118]; *George* v. *City of Los Angeles* (1938), 11 Cal.2d 303, 307 [79 P.2d 723]; *Black* v. *Southern Pac. Co.* (1932), 124 Cal.App. 321, 328 [12 P.2d 981]; *Sandstoe* v. *Atchison, T. & S. F. Ry. Co.* (1938), 28 Cal.App.2d 215, 218 [82 P.2d 216]; *Bigelow* v. *City of Ontario* (1940), 37 Cal.App.2d 198, 204 [99 P.2d 298].) Defendant does not dispute the stated proposition but contends that it is not applicable to a situation where no danger of injury exists at the time of the completion of the improvement. Defendant contends that there was nothing in or about the street or sidewalk as originally completed that was inherently dangerous, but that on the contrary they were then safe and remained safe for some weeks; that an inherent danger is one that exists from the beginning as distinguished from one which merely should be anticipated. Hence, defendant urges that the finding of the trial court that "by reason

of said work the sidewalk and street was [sic] left in a condition which was inherently dangerous'' upon completion of the improvement about January 8, 1941, is unsupported in the record, and that it should be held that plaintiff's injury was due solely to a latent defect caused by the elements, of the existence of which defendant had no knowledge; that unless the improvement as planned and constructed was inherently dangerous from the beginning it cannot be charged with either knowledge or notice of any subsequently developed danger or defect.

In other words, it is the position of defendant that a public street is not inherently dangerous unless it is immediately dangerous. Since the statute (Stats. 1923, p. 675; Deering's Gen. Laws, 1944, Act 5619) imposes liability upon the basis of either a dangerous or a defective condition, defendant must also take the position, if its contention is to have substantial materiality, that an improvement is not inherently defective unless, at the moment of completion and under the conditions then existing, it is actually defective for the purpose and use for which it was constructed. Stated still differently, the effect of defendant's argument in this regard is that a potential or latent danger or defect is not inherent. This position is untenable. A quality or attribute is said to be inherent when it is ''Firmly or permanently contained or joined; infixed; indwelling'' or ''Involved in the constitution or essential character of anything.'' (Webster's New Int. Dict. (2d ed.)) The expression ''inherently dangerous'' has been defined to mean ''that in the end there inheres danger.'' (*Majestic Theater Co.* v. *Lutz* (1925), 210 Ky. 92, 100 [275 S.W. 16, 20].) A public highway constructed to encompass a sharp turn without warning sign or marker might be reasonably safe in daylight with clear atmosphere and a dry roadway but it could nevertheless be inherently dangerous for use in fog and rain. (See *Rippe* v. *City of Los Angeles* (1942), 50 Cal.App.2d 189, 196 [123 P.2d 47].) If the improvement is designed to be used without inspection and maintenance and under varying conditions which are normally to be anticipated then it should be made reasonably safe for ordinary use under all of those conditions and if, under any one or more of them, it is, or naturally will become, unsafe for such use because of its planned design then it is inherently dangerous. The defect and danger are no less inherent merely because the anticipated and to be expected conditions which activate such

defect and danger are to be present only occasionally. Here the rains and the erosion were actually expected yet the sidewalk was left open to the public for use after the rains as well as before and with no warning based on the defendant's superior knowledge of the danger created.

In *Black* v. *Southern Pac. Co.* (1932), *supra,* 124 Cal.App. 321, 328, the court said, "While the record discloses no evidence that the engineer or any member of the board of public works had knowledge or notice [of the dangerous condition] before the accident . . . it has been held that where the dangerous condition is due to the negligent act or omission of the officers doing or directing the work it is unnecessary to prove as a condition to liability that they had notice of the condition, and the authority and duty, with funds available, to correct it (*Moore* v. *Burton,* 75 Cal.App. 395 [242 P. 902]). *Nor should a different rule prevail where a proposed improvement will be reasonably certain to endanger the public unless precautionary measures are taken as a part of the projected work, and it is completed and left without the necessary safeguards.*" (Italics added.)

In *Mulder* v. *City of Los Angeles* (1930), 110 Cal.App. 663, 668 [294 P. 485], a contractor with the permission of the board of public works made a fill and embankment above plaintiff's property. The engineer's report did not require that in connection with the work any means should be provided for drainage of storm surface waters. When "a usual and common rainstorm" came soon after the work was completed water collected behind the embankment, overflowed, and caused sand and debris to come down upon and injure plaintiff's property. In holding the defendant liable under the Public Liability Act the court said: "The board of works knew that this work was to be done, as requested and permitted in accordance with the recommendation of the city engineer, and knew that said recommendation did not contain any provision for protection of property in the ravine, against damage which reasonably might have been expected to result from the work as proposed to be done. Such knowledge, in view of the physical situation of the streets and adjacent property, was equivalent to notice of the dangerous condition which would be created by the proposed changes if permitted to be done without some provision for suitable drainage. To hold otherwise would be to presume that the board had the right to act without even attempting to exercise its intelligence

in passing upon a subject of substantial importance." In the Mulder case there was no actual and present danger of immediate damage until the arrival of the rainstorm and the collection of water behind the embankment, yet it was held, and properly so, that the city had created a dangerous condition. Since the rains and flooding of the embankment were normally to be anticipated the danger was inherent from the time the fill was made.

Even if we could interpret the essential elements of the plan of improvement shown here as not calling for an inherently dangerous or defective condition it would avail defendant nothing on the record before us. Actual notice of a defective or dangerous condition is not required. Constructive notice satisfies the statute. (*Laurenzi* v. *Vranizan* (1945), 25 Cal.2d 806, 812 [155 P.2d 633] ; *Dawson* v. *Tulare Union High School* (1929), 98 Cal.App. 138, 142 [276 P. 424] ; *Hook* v. *City of Sacramento* (1931), 118 Cal.App. 547, 553 [5 P.2d 643] ; *Bennett* v. *Kings County* (1932), 124 Cal.App. 147, 153 [12 P.2d 47].) Constructive notice is defined by section 19 of the Civil Code as that knowledge of circumstances "sufficient to put a prudent man upon inquiry as to a particular fact" where "by prosecuting such inquiry, he might have learned such fact." The rules governing constructive notice require reasonable diligence in making inspections for the discovery of unsafe or defective conditions. (*Laurenzi* v. *Vranizan* (1945), *supra*, pp. 811-812; *Nicholson* v. *City of Los Angeles* (1936), 5 Cal.2d 361, 364-365 [54 P.2d 725].) Where the authorities who have planned and constructed an improvement have knowledge of circumstances which reasonably might be expected to result in a dangerous condition as a natural and probable consequence of the work, such authorities are put upon inquiry, and it follows that it is incumbent upon them to make inspections commensurate in scope with the nature and character of their knowledge and the peril which should be avoided.

As to what constitutes a dangerous or defective condition no hard-and-fast rule can be laid down, but each case must depend upon its own facts. (*Rafferty* v. *City of Marysville* (1929), *supra*, 207 Cal. 657, 661; *Hook* v. *City of Sacramento* (1931), *supra*, 118 Cal.App. 547, 552.) Whether a given set of circumstances creates a dangerous or defective condition is primarily a question of fact. (*Sandstoe* v. *Atchison, T. & S. F. Ry. Co.* (1938), *supra*, 28 Cal.App.2d 215, 218;

*Bigelow* v. *City of Ontario* (1940), *supra*, 37 Cal.App.2d 198, 204.) ▮ The findings of the trial court must be sustained if they are supported by substantial evidence. All legitimate and reasonable inferences must be indulged toward upholding the findings. Appellate courts, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. (*Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689].)

▮ Having in mind the foregoing principles we cannot hold that as a matter of law, upon the evidence before us, a dangerous or defective condition was not created by defendant or that injury to the public was not reasonably foreseeable. The testimony of Milton Rader above referred to, showing his knowledge of past occurrences and of eventualities reasonably to be expected in connection with such improvements as those made on West Palm Street, together with the physical facts regarding the hilly terrain, the impending rainy season, etc., satisfactorily supports the finding that the defendant had the requisite notice of a dangerous condition resulting from the jagged termination of the friable oil coating on the dirt sidewalk which was susceptible to deterioration, undermining, and erosion. ▮ We do not think that a city should escape liability for damages caused by hidden defects in its sidewalks where it makes no inspections of such sidewalks and does not repair them, although it knows that such defects, while originally potential, are inherent in the plan of street improvement and, under conditions which are bound to occur, should reasonably be expected to become actual and imminent unless vigilance in care and maintenance is exercised. ▮ Under such circumstances whether the sidewalk is immediately dangerous when constructed is immaterial because it is at least defective by reason of being potentially dangerous, and the statute requires no more. It is to be remembered in this regard that the city, although expecting erosion, made no effort to inspect, maintain, or repair its "unimproved" sidewalks except as dangerous conditions were reported to it by members of the public.

▮ The evidence discloses no necessity, so far as improvement of the roadway was concerned, for spraying oil on the sidewalk to the extent shown here, but an oiled surface did

result to the knowledge of the defendant through its responsible officer and nothing was done thereafter to remedy the situation. The oil sprayed over the street and against the curb provided a seal tending to prevent erosion of the street and curb but was wholly ineffectual to prevent erosion of the sidewalk where the oiled surface jaggedly ended. The line of termination of the oil coating could have been expected to obstruct the flow of rain water over the walk toward the street and thus to tend to cause more percolation of rain water at that point. The oil coating ended in the middle of that portion of the sidewalk most used by the public. The portion so oiled may well have conveyed to the plaintiff the impression that it was stronger and the more appropriate part of the walk to use. Plaintiff's Exhibit 2 (a photograph in evidence) shows that in March, 1941, the sidewalk, except a strip 30 inches wide nearest the curb, was not usable because it was gullied and torn by erosion of rainwater coming down from the bank on the north; thus it should have been obvious upon inspection that the strip of sidewalk given the oil surfacing would be the portion most used. ▪ Furthermore, in the absence of regulations (of which there were none here) or obvious defects, a pedestrian is entitled to use every part of a street or sidewalk and defendant's duty to repair is coextensive with that right. (*McLaughlin* v. *City of Los Angeles* (1943), 60 Cal.App.2d 241, 245 [140 P.2d 416].) Even if we assume that the sidewalk in question was technically "unimproved" it avails defendant nothing. ▪ The contention that pedestrians use an unimproved street entirely at their own risk and that a city is not liable for injuries caused by any defect therein is not tenable. Under the Public Liability Act (Stats. 1923, p. 675; Deering's Gen. Laws, 1944, Act 5619) a city is liable for injuries proximately resulting from the dangerous or defective condition of its public street whether such street is improved or unimproved. (*McLaughlin* v. *City of Los Angeles, supra,* p. 243.)

▪ Defendant attacks the testimony of Mrs. Crawford, who stated that "around the first of January" she had seen the hole into which plaintiff fell; that at that time it was very small but that it became larger after the rains. Defendant urges that this testimony is not worthy of credence for the reasons that the evidence was conflicting and, in particular, that the street improvement was not completed until the 8th of January. Obviously Mrs. Crawford's testimony purported to be only an approximation as to date and the weight thereof

was for the trial judge. This witness also testified that about one week before the plaintiff was injured she (Mrs. Crawford) suffered a similar fall, the sidewalk crumbling under her. Upon cross-examination she testified that she "couldn't swear it was at the same spot, but it was right in that neighborhood." This qualification went to the weight of the evidence, not to its competency. The testimony was relevant as tending to show both the dangerous character of the improvement which had been installed and conditions which would tend to charge the city with knowledge or notice of the fact. (See *McCormick* v. *Great Western Power Co.* (1932), 214 Cal. 658, 665 [8 P.2d 145, 81 A.L.R. 678]; *Gorman* v. *County of Sacramento* (1928), 92 Cal.App. 656, 664 [268 P. 1083].)

Defendant contends that to hold it bound to foresee and to guard against the development of erosion under the circumstances shown would be to preclude use of this type of improvement; that it would make the city an insurer of the safety of its streets; that a reasonable inspection would not have disclosed the defects in the sidewalk or street or the dangerous character thereof and for such reason alone, if no other, constructive notice cannot be predicated upon the hole in the street, Mrs. Crawford's fall, or other indicia disclosed in the record. We think that no extended discussion is necessary in respect to the points last mentioned. They are largely disposed of by what has already been said. Obviously, the city is not being held as an insurer of anything but it is being held to the standard of ordinary care in planning, constructing, and maintaining its streets and sidewalks. Liability for its failure in that regard is not due to the whimsy of court or jury; it is imposed by the public liability statute. The evidence amply establishes that the improvement here was inherently defective in its original plan. But even if we could regard the plan as proper the evidence shows that a defective and dangerous condition did arise and that defendant is chargeable with notice of it. Such evidence tends to show that the actual danger which was imminent in March was apparent at a much earlier date. Defendant in January directly and knowingly caused or permitted the oil to be sprayed onto a part of the sidewalk and made no effort to clear away the resulting deceptive crust or to mark it as dangerous although it knew that erosion was imminent. It made some provision against erosion on the private property adjacent to the cuts and excavations; it likewise made some provision against ero-

sion of the roadway and curb; but, having opened up and graded a sidewalk which it invited the public to use and which hundreds of pedestrians did use daily, it left that sidewalk uninspected in the rainy season, knowing that it was so graded that run-off water from the hillside would and did flow over it toward the oiled strip and knowing also that no provisions against undermining of that strip had been made. It made some inspections of the roadway and observed damage there but it did not look at the sidewalk. It now seeks to justify its conduct by announcing for itself a rule that it assumes no responsibility for the condition of the sidewalk and that pedestrians must use the same at their own risk. But its legal duty in the premises is defined by general law (Stats. 1923, p. 675; Deering's Gen. Laws, 1944, Act 5619) and negligence and liability therefor do not depend upon, and cannot be limited by, self-formulated standards. Negligence is not the act itself but is a fact which defines the character of an act in respect to its being a civil wrong. (*McAllister* v. *Brown* (1931), 114 Cal.App. 239, 240 [299 P. 753].) The determination of that fact rests with the court, not the actor. We are satisfied that the evidence fully supports the essential findings and that no prejudicial error is shown.

For the reasons above stated the judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Spence, J., concurred.

EDMONDS, J.—As I read the record in this case, there is no evidence of a dangerous or defective condition for which the city is responsible unless rules which have been stated and applied in many decisions of this court are now to be abandoned. In effect, my associates now make a city the insurer of the safety of everyone using its public streets with the obligation to keep them in such regair as to preclude the possibility of injury to one traveling upon them, a standard of care impossible to meet and far beyond any reasonable construction of the statute imposing municipal liability under stated and restricted circumstances.

The trial court found that the city "negligently maintained" the street and the sidewalk and that, at the time of the accident, they were "in a dangerous and defective condition." Also, it is said, the city upon grading and oiling the street and sidewalk, left them in an inherently dangerous con-

dition which was known to the city and not known to the plaintiff. Because of the hole in the street, which had existed some time prior to the date of the accident, the street and sidewalk "were made dangerous and defective." Further, the court found, the city and its officers who had authority to remedy the "dangerous and defective condition" had notice of the situation but failed to remedy it.

Justification for these findings is first placed upon the ground that the testimony of the street superintendent supports the conclusion that the city "had the requisite notice of a dangerous condition resulting from the jagged termination of the friable oil coating on the dirt sidewalk which was susceptible to deterioration, undermining and erosion." But his statement was only to the effect that, during the rainy season, a certain amount of erosion is to be expected; it includes nothing from which the court could reasonably infer that the witness, or anyone else, reasonably could have foreseen that rainwater would undermine the oiled portion of the sidewalk in such a manner as to leave the surface apparently intact. Otherwise stated, the street superintendent, the evidence clearly shows, fully understood that the winter rains would wash across and erode an unimproved sidewalk of a hillside street and, according to his explanation, the city undertook to repair "a bad wash or something . . . reported to us as dangerous." However, there is no evidence in the record tending to show that he had any reason to believe erosion would take place in such a way as to leave a latent defect which was not apparent to one using the sidewalk. To the contrary, he testified that the purpose of oiling the dirt street and curb was to prevent "ordinary erosion."

Yet Mr. Justice Schauer impliedly uses this testimony as the basis for his statement that the undermining of the oil coated surface on the sidewalk was a hidden defect originally potential and inherent in the plan of street improvement under conditions which are bound to occur. "The evidence amply establishes," he says as a second ground of decision, "that the improvement here was inherently defective in its original plan." I find no such evidence, nor any basis for the statement in the succeeding sentence that if the plan of construction may be regarded as proper, "the evidence shows that a defective and dangerous condition did arise and that the defendant is chargeable with notice of it." This evidence,

it is said, tends to show that the situation which was apparent in March could have been seen at a much earlier date. The reasoning in this regard is that the oil sprayed upon a part of the sidewalk formed a "deceptive crust" and the city "left the sidewalk uninspected in the rainy season, knowing that it was so graded that run-off water from the hillside would and did flow over it toward the oiled strip and knowing that no provisions against undermining of that strip had been made." Certainly it is not enough that, at the time of the accident, there was a defect in the sidewalk; many unusual and unforeseeable things in fact occur.

The record includes no evidence showing that the crust of oil would be undermined by erosion in a manner not readily visible to any user of the sidewalk. Knowledge that erosion would occur is not the equivalent of knowledge that water might work under the oiled surface through subterranean crevices or in some unusual manner. But to extend the effect of the evidence, my associate calls to his aid the strange doctrine stated in *Estate of Bristol*, 23 Cal.2d 221 [143 P.2d 689], declaring that in reading the record to ascertain whether there is evidence sufficient to sustain a finding, "the court should be realistic and practical." In effect, he says, there is no evidence tending to prove that the oil on the sidewalk created either a dangerous or defective condition, but because, as the street superintendent admitted, rain causes erosion, the court should realistically and practically extend the evidence to support a finding of liability on account of a condition which was known to the city and not known to the plaintiff.

Under these circumstances, in my opinion, the judgment is not sustained by any proof and should be reversed.

Traynor, J., concurred.

Appellant's petition for a rehearing was denied April 26, 1945. Edmonds, J., and Traynor, J., voted for a rehearing.